Courtney Stuart-Alban (SBN 225513)
Juan Pablo Alban (SBN 218144)
STUART ALBAN LAW
87 N. Raymond Ave., Ste. 200
Pasadena, CA 91104
Telephone: 323-405-9898
courtney@stuartalbanlaw.com
jp@stuartalbanlaw.com

Lizelle S. Brandt (SBN 228250)
SINGIAN LAW
1055 E. Colorado Blvd., Ste. 500
Pasadena, CA 91106
Telephone: 626-844-5050
Facsimile: 626-844-5051
lizelle@singianlaw.com

**Attorneys for Plaintiffs
and the Proposed Class**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DR. LISBETH W. ROY, a Florida resident; SINGLETON SURGICAL INSTITUTE, LLC; a Georgia limited liability company; NET RETAILERS, LLC, an Illinois limited liability company; and MEDALLION FINANCIAL GROUP, a Maryland corporation.<br><br>Plaintiffs,<br><br>v.<br><br>SALESFORCE, INC., a Delaware corporation, and DOES 1-5,<br><br>Defendants. | Case No. 3:24-cv-01219-JD<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>***Concurrently filed with Request for Judicial Notice***<br><br>Judge:  Hon. James J. Donato<br>Date:   March 6, 2025<br>Time:   10:00 a.m.<br>Crtrm.:  11 |

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

I.    INTRODUCTION ................................................................................................................ 1

II.   STATEMENT OF ISSUES TO BE DECIDED ................................................................... 2

III.  STANDARD OF REVIEW ................................................................................................. 2

     A.  Standard for Review. ..............................................**Error! Bookmark not defined.**

IV.   LEGAL ARGUMENT .......................................................................................................... 2

     A.  Dr. Roy has Standing to Bring this Action. ............................................................ 2

     B.  The FAC States a Claim that the MSA's Termination Penalty is Invalid. ............... 4

          1.  The Termination Provision is an Unenforceable Penalty ............................ 4

          2.  Plaintiffs Rebut the Presumption and Meet their Burden under Section
              1671 by Making Claims that, if Accepted as True, Demonstrate
              Unreasonableness ....................................................................................... 5

          3.  The Court Cannot Find the Termination Clause Reasonable on the
              Pleadings ..................................................................................................... 8

     C.  The Complaint States a Claim that Salesforce's MSA is Unconscionable. ............. 8

          1.  The FAC Alleges the Following Re: Surprise and Oppression ................. 10

          2.  The FAC Alleges the Following Re: Substantive Unconscionability ....... 11

     D.  The Complaint Properly Pleads Actionable Statements that are Not Puffery. ....... 12

     E.  Breach of the Implied Covenant ........................................................................... 15

     F.  Plaintiffs State a Claim for Rescission .................................................................. 16

V.    CONCLUSION ................................................................................................................. 17

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 489 (1982)..........................................9, 10, 15
*Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1025-26 (N.D. Cal. 2012)................................................12
*Ebbert v. Mercantile Trust Co.* 213 Cal. 496, 499 (1931)......................................................................4
*Garrett v. Coast & Southern Fed. Sav. & Loan Assn.*, 9 Cal.3d 731, 739 (1973)....................................5
*Gormley v. Gonzalez,* 84 Cal. App. 5th 72, 86-87 (2022) ...................................................................7, 8
*Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1406 (2003) .........................................................................10
*In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794-96 (9th Cir. 2017)..........................................15
*In re Countrywide Financial Corp. Securities Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008)..................12
*In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 120 (2009) ..................................................................12
*Klein v. Asgrow Seed Co.* 246 Cal.App.2d 87, 97 (1966) .......................................................................16
*Lake River Corp. v. Carborundum Co.*,769 F.2d 1284, 1290 (7th Cir. 1985)...........................................6
*Mani Nutraceuticals*, U.S. Dist. LEXIS 174395 at *8-9 (C.D. Cal. June 2017) .......................................9
*McLellan v. Fitbit, Inc.*, 2018 U.S. Dist. LEXIS 94685, at *6-7 (N.D.Cal.) (J. Donato) .................13, 14
*Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1321-22 (2005)........................................9
*Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ...............................................................................14
*Perdue v. Crocker National Bank* 38 Cal. 3d 913, 931 (1985)..................................................................4
*Ridgley v. Topa Thrift & Loan Ass'n,* 17 Cal. 4th 970, 977 (1998) ..........................................................4
*Rodriguez v. Walmart Inc.,* 2023 U.S. Dist. LEXIS 53253, at *14 (S.D.N.Y.).........................................15
*Sarchett v. Blue Shield* 43 Cal. 3d 1, 13 (1987) .....................................................................................15
*Shroyer v. New Cingular*, 498 F.3d 976, 985 (9th Cir. 2007) ...................................................................9
*Simmons v. California Institute of Technology* 34 Cal. 2d 264 (1949).....................................................17
*Sybron Corp. v. Clark Hosp. Supply Corp.*, 76 Cal. App. 3d 896, 903 (1978) ..........................................5
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007) .....................................2, 12
*U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.* U.S. Dist. LEXIS 38768 (S.D.N.Y. Mar. 5,
2013) ...........................................................................................................................................12, 14, 15
*Vigil v. General Nutrition Corp.,* 2015 U.S. Dist. LEXIS 63506 (S.D. Cal. May 13, 2015) ..................14
*Vitatech Internat., Inc. v. Sporn*, 16 Cal. App. 5th 796, 811 (2017)....................................................7, 8
*West v. eHealth, Inc.*, 2016 U.S. Dist. LEXIS 33429, at *21-22 (N.D. Cal.) (J. Donato)......................13

<u>Statutes</u>

Cal. Bus. & Prof. Code § 17500 .............................................................................................................12
Cal. Civ. Code § 1670.5...........................................................................................................................2
Cal. Civ. Code § 1671(b)......................................................................................................................5, 7
Fed. R. Evid. 801 .....................................................................................................................................3

<u>Other Authorities</u>

Cal. Law Revision Com. com., Deering's Ann. Civ. Code, § 1671 ......................................................7, 8

<u>Rules</u>

Fed. Rule of Civ. Proc. Rule 9(b) ...........................................................................................................12
Federal Rule of Civil Procedure Rule 12 ..................................................................................................2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendant Salesforce, Inc. ("Salesforce" or "SFDC") uses deceptive and unfair business practices to trap small businesses in ironclad contracts for expensive software they cannot use.  As the First Amended Complaint ("FAC") alleges, the "Salesforce business model is centered around a ubiquitous marketing campaign that misrepresents the costs, ease-of-use, and performance capabilities of the Salesforce software to lure individuals and businesses to enter into unconscionable, unlawful adhesion contracts that: (i) misrepresent the cost of the software by material amounts, (ii) impose no material obligations on Salesforce, and (ii) make it impossible to cancel for any reason."  [ECF 23 ¶2].

Salesforce asks the Court to give its business practices California's stamp-of-approval as a matter of law and to dismiss the Plaintiffs' Complaint with prejudice.  However, there is no precedent for the business model that Salesforce asks the Court to condone.  California law does not allow Salesforce, a mega cap corporation, to use aggressive, direct-marketing sales tactics to pressure small businesses to purchase expensive, years-long subscriptions for complex software-as-a-service (SaaS) systems under the guise that the software will be "easy to use" "out of the box" and the customer "won't pay for any features [they] don't use" – when Salesforce *knows* this is not true. [ECF 23 ¶ 150]. Salesforce intentionally misrepresents essential characteristics of the software and employs what are essentially sophisticated "dark patterns" to trick small businesses into signing up for expensive subscriptions with undisclosed, unconscionable contract terms, including that the SaaS will cost multiple times the contract amount to implement (if implementation can be accomplished at all) and the customer will have no ability to terminate or modify the contract upon discovering they have been misled.

The predatory contracting practices that Salesforce asks this Court to condone – as a matter of law – fly in the face of fundamental California public policy, a point driven home upon reading distressing review-after-review from customers around the world who detail shocking circumstances of oppression and surprise when they are left paying for expensive subscriptions they cannot use. [ECF 23, Ex. C and RFJN, Exs. F-G].  Salesforce says this is not a problem. The contract is the contract, after all. California allows this, they say.  Plaintiffs, however, refuse to believe Salesforce's predatory practices are permitted under California law, and they have come to California to file this class action in

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

Salesforce's home jurisdiction of San Francisco, as the Salesforce contract requires everyone in the United States to do (as well as everyone in North, Central, and South America) to obtain even the most minimal relief, since Salesforce does not entertain any request for contract termination or modification, and its contracts provide no option for arbitration. The California legislature has empowered California courts "to police explicitly against the contracts or clauses they find to be unconscionable" (comment to Cal. Civ. Code 1670.5), and this case presents a critical opportunity for this Court to do just that.

## II.    STATEMENT OF ISSUES TO BE DECIDED

Whether Salesforce's Motion to Dismiss ("Motion") clearly establishes on the face of pleadings that no material issue of fact remains and Plaintiffs' FAC should be dismissed with prejudice.

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure Rule 12(b)(6), the Court must accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party. A court is required to read the complaint as a whole, together with matters appropriate for judicial notice, rather than isolating allegations and taking them out of context. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).

## IV.    LEGAL ARGUMENT

### A.    Dr. Roy has Standing to Bring this Action.

Salesforce repeats the argument it made in its motion for judgment as a matter of law [ECF 11] that plaintiff Dr. Lizbeth Roy does not have standing because she is not the "real party in interest" with "rights under the contract." [ECF 24 at 12].  Salesforce argues (i) Doctor's Studio was the "Customer" identified on the Order Form that Dr. Roy signed, and (ii) Dr. Roy is not an "Affiliate" as described separately in the MSA, which (as discussed *infra*) Plaintiffs are not required to review and did not review or consent to its terms.  Even assuming the governing effect of the MSA, however, Salesforce is wrong that Dr. Roy is not a Customer or Affiliate: she was both.

Dr. Roy was the "real party in interest" as the Customer, because, under Florida law, as in California, "[a] sole owner is a sole proprietorship and its owner are essentially one and the same.*" S.-Owners Ins. Co. v. Grainger*, No. 2:19-CV-14004, 2019 U.S. Dist. LEXIS 206074, at *4 (S.D. Fla. Nov. 26, 2019).  Here, Salesforce concedes that "Dr. Roy signed the MSA" [ECF 23 at 12:18] and the FAC

"alleges Doctor's Studio was her "fictitious business." *Id*. at 12:28. The FAC further alleges: "At all

relevant times, Dr. Roy was doing business as a sole proprietor of Doctor's Studio, a Florida fictitious

business formerly owned and operated solely and exclusively by Dr. Roy." [ECF 23 at ¶¶ 13, 56.]

Salesforce argues that Dr. Roy signed the Order Form "representing herself" as a "C-Level Executive."

[ECF 23 at 12:19-20]. However, Exhibit A to the FAC shows she signed as "Lisbeth Roy, DO" with the

"Business Title" of "Owner" and the "Authority Level" of "C Level Executive," as shown below. [ECF

23: 44].

First, Plaintiff objects on hearsay grounds to the extent Salesforce relies on statements on the

Order Form as proof of the truth of Doctor's Studio's corporate status, despite contrary statements in the

FAC. Fed. R. Evid. 801. Moreover, publicly available records on the Florida State Department's

website identify Lisbeth Roy as the sole owner of the fictitious business name Doctor's Studio from at

least 2010 through 2020. [RFJN ECF 14 Exs A- C.] Defendant cites no authority, and Plaintiff has

found none holding that use of "C-Level Executive" converts its legal status to a corporation.

Dr. Roy also qualifies as an Affiliate under the MSA, which defines Affiliate as "any entity that

directly or indirectly controls, is controlled by, or is under common control with the subject entity.

'Control,' for purposes of this definition, means direct or indirect ownership or control of more than

50% of the voting interests of the subject entity." [ECF 23 at 12:26-28.] The FAC alleges Dr. Roy

indeed had "direct control" over the "subject entity." If Salesforce's argument rests on the premise that

an individual cannot be an "entity," it is belied by the legal dictionary definition of "entity," as well as

by common usage. [ECF 14 at Ex. D]. The Court should decline Salesforce's invitation to presume the

FAC's allegations are false and to conclude instead that Doctor's Studio was a separate ***corporate*** entity.

No case cited by Salesforce discusses the legal statute of a "dba," sole proprietorship, or fictitious

business; thus, none is authoritative on this issue.  Finally, the Court should defer ruling on Salesforce's argument that Dr. Roy is not a proper class representative, per its prior order.  [ECF 20].

**B.** **The FAC States a Claim that the MSA's Termination Penalty is Invalid.**

**1.** The Termination Provision is an Unenforceable Penalty

The FAC pleads that Salesforce's MSA imposes a "Termination Penalty" ("TP") on customers who "terminate and stop payment" on their subscriptions before the term's end when the Services do not perform as Salesforce promised, as occurred with Plaintiffs and the putative class, all of whom were unable to use Salesforce's Services, at all. [ECF 23 ¶ 6, 9, 10, 143 ("shocked")].  Upon such "default" the TP "kicks in to impose an unlawful penalty that accelerates and makes all remaining payments due in full, with arbitrary interest added at 1.5% per month." [ECF 23 ¶ 6].  Salesforce recharacterizes this as an "acceleration clause" without mentioning (i) the 1.5% surcharge imposed on the entire amount, (ii) the failure to deduct for costs saved by not providing the services, or (iii) the failure to discount for present value. Regardless of the nomenclature, however, the clause is an unenforceable penalty, because it is triggered by default, and it does not represent a reasonable endeavor to estimate a fair average compensation for any loss that may be sustained.  *Ridgley v. Topa Thrift & Loan Ass'n,* 17 Cal. 4th 970, 977 (1998).

As the California Supreme Court explained, "a penalty provision operates to compel performance of an act and usually becomes effective only in the event of default upon which a forfeiture is compelled without regard to the damages sustained by the party aggrieved." *Ridgley, supra,* 17 Cal. 4th at 977 (1998).  See also *Perdue v. Crocker National Bank* 38 Cal. 3d 913, 931 (1985) ("An amount disproportionate to the anticipated damages is termed a 'penalty.' A contractual provision imposing a 'penalty' is ineffective, and the wronged party can collect only the actual damages sustained."); *Ebbert v. Mercantile Trust Co*. 213 Cal. 496, 499 (1931) ("Any provision by which money or property would be forfeited without regard to the actual damage suffered would be an unenforceable penalty.").

Here, Salesforce concedes the termination clause is triggered "in the event of a default" [ECF 24 at 14:6], which is a defining characteristic of unenforceable penalties. *Ridgley, supra,* 17 Cal. 4th at 977. Salesforce also recognizes enforceable "[l]iquidated damages [clauses] are . . . a sum which a

contracting party agrees to pay for breach of a contractual obligation." [ECF 14 at 11-12]. Indeed, California provides that a valid clause "must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.*, 9 Cal.3d 731, 739 (1973). Yet, Salesforce admits the MSA makes no "reasonable endeavor" to "estimate a fair average compensation." Instead, it simply "accelerate[s] Customer's unpaid fee obligations . . . so that all obligations become immediately due and payable." [ECF 24 at 14:7-8].

Salesforce argues "[u]nder California law, similar provisions have been upheld as reasonable to ensure payment of contractual obligations," citing *Sybron Corp. v. Clark Hosp. Supply Corp.*, 76 Cal. App. 3d 896, 903 (1978) ("*Sybron*"). [ECF 24 at p. 14:9-10.] But Salesforce misrepresents the holding in *Sybron*, and California law. In *Sybron*, the appellate court **reversed** the trial court, finding it had "failed to take into account the need for proportion in damages – the critical item in evaluating penalty and forfeiture." *Sybron* at 903. The *Sybron* Court held the penalty bore "no reasonable relationship to actual damages" and used its "equitable powers to insure that the ultimate obligation imposed … [was] not unreasonable." *Id*. Salesforce cites no authority that similar clauses have been upheld under California law.

### 2. Plaintiffs Rebut the Presumption and Meet their Burden under Section 1671 by Making Claims that, if Accepted as True, Demonstrate Unreasonableness.

The FAC states claims sufficient to rebut the presumption under Cal. Civ. Code Section 1671(b) by establishing that the "provision was unreasonable under the circumstances existing at the time the contract was made." Cal. Civ. Code Section 1671(b). The FAC pleads that "Salesforce has a pattern and practice of refusing even to consider allowing early termination for any reason, even when Salesforce's culpability is obvious and egregious" [ECF 23 ¶ 6, Ex B] and many customers, as demonstrated by public complaints, were not able to use the software, at all. So, for example, in the case of Net Retailers, the FAC has pled facts establishing that the MSA is unreasonable in demanding immediate payment of the $1.2 million remaining on Net Retailers' five-year contract, even though Net Retailers has already paid Salesforce $1.8MM and spent over $800,000 in implementation costs yet has **never** been able to use the software to achieve even the same functionality that it had enjoyed before

engaging Salesforce. [ECF 23 ¶¶ 91, 107]. The FAC establishes that the termination clause was unreasonable "at the time it was made" because, as the free-market-enthusiast Judge Posner explains, it "is designed always to assure [Salesforce] more than its actual damages" because the liquidated damages formula is the full contract price minus the amount already invoiced." *Lake River Corp. v. Carborundum Co.*,769 F.2d 1284, 1290 (7th Cir. 1985). Judge Posner also notes: "[d]iscounting to present value is widely recognized as an essential element of enforceable liquidated damages . . . [a]nd any formula that is guaranteed to produce greater than actual damages necessarily results in an unenforceable penalty rather than a valid assessment of liquidated damages." *Id.* at 1290.

Here, as in *Lake River*, the "interruption of performance" caused by Plaintiffs' notice of early termination "generate[s] considerable cost saving that is not reflected in the damage formula." *Lake River* at 1286. Salesforce argues the acceleration clause is "reasonable" because it reflects Salesforce's "ongoing obligations" and allows it to "recover the cost of providing … ongoing maintenance, technical support, and data hosting." [ECF 24 at 23-24]. This ignores the FAC's allegations that Plaintiffs will never use the services, which "generates considerable cost savings not reflected" in the penalty. The TP also does not discount for present value and thus "necessarily results in an unenforceable penalty rather than a valid assessment of liquidated damages." *Id.* at 1290.

Salesforce cites no authority to support a finding that the TP is reasonable as a matter of law. For instance, in *First Am. Commer. Bancorp v. Vantari Genetics*, 2020 U.S. Dist. LEXIS 156044, at *10 (C.D. Cal. Mar. 12, 2020) [ECF 24 at 16:1,13] ("*First Am.*"), the Court found: "[t]he amount set as liquidated damages must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." However, this is precisely what Plaintiff alleges the MSA does <u>not</u> do. Moreover, *First Am* concerned a personal guaranty on a loan for an equipment lease. That the *First Am* court found - after discovery in the context of summary judgment - that the acceleration clause bore "a reasonable relationship to the range of actual damages"– does not mean that acceleration clauses are *prima facie* reasonable under California law. [ECF 24 at 16:13]. Further, there was no argument in *First Am.* that the defaulting party did not use the equipment or returned it early, whereas Plaintiffs object to paying the TP for services they never used.

1    Salesforce also cites *Hammon Plating Corp. v. Wooten*, 2017 U.S. Dist. LEXIS 156784, at *28-

2    29) (N.D. Cal. Sep. 25, 2017) [ECF 24 at 16:14], which held a default interest rate in a promissory note

3    reasonable that was "equivalent to the post-judgment interest rate set by statute."  However, the

4    plaintiffs did not borrow and receive money from Salesforce; they contracted to license software that

5    was misrepresented to them and unusable. In *Vitatech*, the court explained that whether a contract clause

6    is void under Section 1671(b) "becomes a question of law only when undisputed facts support a single

7    reasonable conclusion." *Vitatech*, 16 Cal. App. 5th at 808.  Such is not the case here.  Moreover, in

8    *Vitatech*, the courts found the clauses were penalties because the parties "did not attempt to anticipate

9    the damages that might flow from a breach . . . Rather, they simply selected the amount [the plaintiff]

10   claimed" as the initial amount owed.  *Vitatech*, 16 Cal. App. 5th at 811.  Here, Salesforce "simply

11   selected the [full term] amount" without attempting to approximate damages that might flow from early

12   termination.

13   Finally, Salesforce does not address the additional factors the California Legislature directs

14   courts to consider when evaluating liquidated damages clauses. "Other relevant considerations in the

15   determination of whether the amount of liquidated damages is so high or so low as to be unreasonable

16   include, but are not limited to, such matters as the relative equality of the bargaining power of the

17   parties, whether the parties were represented by lawyers at the time the contract was made, the

18   anticipation of the parties that proof of actual damages would be costly or inconvenient, … and whether

19   the liquidated damages provision is included in a form contract." Cal. Law Revision Com. com.,

20   Deering's Ann. Civ. Code, § 1671; compare *Gormley*, 84 Cal. App. 5th at 84-85 (finding "these were

21   parties with relatively equal bargaining power who were represented by counsel, and the liquidated

22   damages provision was not part of a form contract").

23   All of these factors weigh in Plaintiff's favor.  The FAC alleges Salesforce "had superior

24   bargaining power and drafted the MSA" [ECF 23 ¶ 34]; "Plaintiff did not have attorney representation to

25   enter into the MSA, and the MSA did not advise that the customer should have an attorney review its

26   terms" [ECF 23 ¶ 41]; and the MSA was a form adhesion contract, presented on a take-it-or-leave-it

27   basis [ECF 23 ¶ 39].  Finally, Salesforce cannot credibly argue that proving its actual damages would be

28   "costly or inconvenient." Salesforce is a public company mandated in the U.S. to use generally accepted

accounting principles (GAAP), which require it to delineate its cost of goods sold and gross profit margin.  A fair average estimated compensation should be a matter of simple math.

**3.**     The Court Cannot Find the Termination Clause Reasonable on the Pleadings

California Civil Code Section 1671 promotes a "fundamental" public policy, and the California Legislature directs courts to consider "[a]ll circumstances existing at the time of the making of a contract" when determining whether a liquidated damages provision in a nonconsumer contract is unreasonable. (Cal. Law Revision Com. com., Deering's Ann. Civ. Code, § 1671; *Honchariw v. FJM Private Mortg. Fund, LLC*, 83 Cal. App. 5th 893, 901-06 (2022) (overturning arbitrator award enforcing liquidated damages in a nonconsumer contract because Plaintiff "cannot be legally bound by an agreement to pay a late-payment fee that violates public policy").

As the cases cited by Salesforce show, the court should consider comparing the TP amount to the actual damages Salesforce would likely recover at trial.  *See* [ECF 24 at p 14:27-28]  (citing *Gormley v. Gonzalez,* 84 Cal. App. 5th 72, 86-87 (2022) (rejecting that "the amount Plaintiffs were estimated to recover if their lawsuits had proceeded to trial is irrelevant to the analysis under section 1671"); [ECF 24 at 16:3, 17] (citing *Vitatech Internat., Inc. v. Sporn*, 16 Cal. App. 5th 796, 811 (2017) ("The record … lacks any evidence suggesting *Vitatech* was likely to recover all of the damages it sought if it proceeded to trial");

We cannot know *from the pleadings* how much Salesforce would likely recover, bringing early termination lawsuits to trial.  Salesforce believes the full contract amount *de facto* represents a "fair average compensation for any loss."  It's pure speculation to believe Salesforce would recover – uniformly, as a matter of law – its *full* contract amounts without any deduction for costs it would save-–much less on an accelerated basis with no consideration for the time value of money.

**C.     The Complaint States a Claim that Salesforce's MSA is Unconscionable.**

"[N]umerous factual inquiries bear upon [the] question" of unconscionability, and conflicts in facts or evidence "should be resolved consistent with the court's finding of unconscionability if [it] is supported by substantial evidence." *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 489 (1982).  Here, the FAC alleges both procedural and substantive unconscionability.

For procedural unconscionability, Salesforce acknowledges the FAC pleads an "adhesion contract" but argues it does not assert "oppression" or "surprise" [ECF 24 at 19:1]. Salesforce argues the FAC does not allege "oppression" because it does not allege Plaintiffs lacked a meaningful choice of reasonably available alternatives," citing *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1321-22 (2005). [ECF 24 at 19:17-19]. The Ninth Circuit, however, has rejected the *Morris* line of cases,[1] finding "a contract may be procedurally unconscionable under California law when the party with substantially greater bargaining power presents a 'take-it-or-leave it' contract to a customer – even if the customer has a meaningful choice." *Shroyer v. New Cingular*, 498 F.3d 976, 985 (9th Cir. 2007). Thus, in the Ninth Circuit, an adhesion contract alone "sufficiently establishes a minimal degree of procedural unconscionability" to proceed past the pleading stage. *Mani Nutraceuticals*, U.S. Dist. LEXIS 174395 at *8-9 (C.D. Cal. June 2017).

Moreover, Salesforce again misrepresents legal authority when it argues that "Plaintiffs are sophisticated business entities who regularly negotiate complex commercial agreements" and that "Courts have consistently held that such parties cannot claim procedural unconscionability." [See ECF 24 at 19:24-27] (citing *A&M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 489 (1982) (*A & M.*). In *A&M,* however, the court found the opposite. The *A&M* court found a contract between "an enormous corporation" and "a relatively small company" was unconscionable noting that "even large business entities may have relatively little bargaining power, depending on the identity of the other contracting party." *A&M* at 135 Cal. App. 3d at 489. Here, the Plaintiffs allege that Salesforce is a "world leader… $316 billion…' mega-cap corporation[]" [ECF 23 ¶ 23] marketing "complicated and expensive software" [ECF 23 ¶ 24] where the "implementation depends on complexity" of factors.[ECF ¶ 59 fn2]. The plaintiffs, meanwhile, are a solo practitioner doctor [ECF 23 ¶ 56], a small company that provides educational and training services for individuals in the medical field who signed up for a $1300

---

[1] As the C.D. Cal. explained in *Mani Nutraceuticals, LLC v. Nat'l Merch. Ctr.,* 2017 U.S. Dist. LEXIS 174395 at *8-9 (CD Cal. June 2017): "In *Shroyer v. New Cingular Wireless Servs., Inc.,* the Ninth Circuit disagreed with the *Morris* court's analysis of the reasonably available alternative sources. See 498 F.3d 976, 985 (9th Cir. 2007). The court stated the Ninth Circuit 'consistently follow[s] the [California] courts that reject the notion that the existence of 'marketplace alternatives' bars a finding of procedural unconscionability.' *Id*.

a year contract but later discovered it would cost $40,000 to implement [ECF 23 ¶¶14, 78]  a financial planning firm whose business Salesforce threatened [ECF 23 ¶ 119], and an online internet retailer whose co-owners "had no prior experience with Salesforce's complex software solutions and was forced to rely on the expertise of Salesforce." [ECF 23 ¶ 86]. California law does not support dismissing Plaintiffs' claims at the pleading stage on these facts. The difference in bargaining power here is even more stark than it was in *A&M*.

The FAC also makes strong claims of "surprise" and substantive unconscionability. Under California law, "surprise" exists when the challenged term is hidden in a prolix printed form or is otherwise beyond the reasonable expectation of the weaker party.  In *A&M*, for instance, the court found unconscionable surprise where the disputed terms were "on the back page" of a preprinted contract where it was "never suggested to him, either verbally or in writing," that he read the back of the form. *A&M,* 135 Cal. App. 3d 473 at 492.  The *A&M* Court held: "[t]he burden should be on the party submitting a standard contract . . .to show that the other party had knowledge of any unusual or unconscionable terms contained therein."  *Id., see also, e.g., Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1406 (2003) (finding "surprise" when contract referenced Better Business rules but did not attach them where, if they had, customer would "receive a nasty shock").

Here, the FAC alleges numerous facts supporting the elements of "surprise" and a finding of substantive unconscionability that extend well beyond the allegations sufficient to support an unconscionability determination under California law.  The FAC alleges, *inter alia*, all of the following:

### 1.    The FAC Alleges the Following Re: Surprise and Oppression

- Plaintiffs were presented with the applicable Order Form to sign via DocuSign®. The Order Form(s) states "Upon signature by Customer and submission to Salesforce.com, this Order Form shall become legally binding." [ECF 23 ¶ 36; Ex. A].  The Order Form includes none of the shocking, unconscionable terms of the MSA; it includes only the price and name of the software product licensed [ECF 23 ¶¶ 6, 26].

- The customer is never required to review, agree to, or sign the MSA  [ECF 23 ¶¶ 7, 28, 87-89]; yet, Salesforce maintains that everyone who signs an Order Form is bound by the terms of the MSA [ECF 23 ¶¶ 28, 36].

- The MSA is referenced only by https:// address in "tiny print" in what "appears to be 9-point font" on the "last page of the Order Form," which merely states it is "governed by the terms

of the salesforce.com Master Subscription Agreement found at
http://www.salesforce.com/company/msa.jsp."  [ECF 23 ¶¶4, 28, 37].

- The MSA is an adhesion contract that – to the extent it was presented to Plaintiffs at all – was presented on a standardized, preprinted form, on a take-it-or-leave-it basis, where Plaintiffs were not afforded an opportunity to negotiate the terms and did not negotiate the terms of the MSA. [ECF 23 ¶¶ 39, 40].

- Plaintiffs did not have attorney representation to enter into the MSA, and the MSA does not advise that the customer should have an attorney review its terms. (¶ 41); Plaintiffs did not view the MSA. [ECF 23 ¶¶ 89, 116].

- Plaintiffs were shocked to discover the materiality of the Implementation Costs after signing the Order Form, by which time they had no meaningful choice under the MSA's oppressive take-it-or-leave-it terms but to pay the full price of the contract while receiving no services. [ECF 23 ¶¶ 59, 78, 142].

- Plaintiffs were also each shocked to discover the draconian Termination Penalty whereby Salesforce refuses to let customers cancel their contracts early without payment of the entire contract amount, irrespective of the reason provided for cancellation. [ECF 23 ¶¶ 120, 143].

### 2.    The FAC Alleges the Following Re: Substantive Unconscionability

- The hidden terms of the MSA include harsh one-sided terms that are unreasonably favorable to Salesforce, the more powerful party. [ECF 23 ¶¶ 41, 42], including all of the following:

  o An unconscionable **Termination Penalty** whereby Salesforce refuses to let customers cancel their contracts early without payment of more than the full amount of the contract on an accelerated basis, plus a 1.5% surcharge, irrespective of the reason provided for cancellation. [ECF 23 ¶¶ 2, 6, 44-47, 69, 81, 109, 119, 120, 143, 145].

  o Unconscionable disclaimers of warranties [ECF 23 ¶¶ 26, 53, 101, 128(e), 141]. even after making express promises about the software's functionality [ECF 23 ¶¶ 2, 3, 76, 78, 83-86, 92, 100, 105].

  o The hidden terms of the MSA impose only illusory obligations on Salesforce [ECF 23 ¶¶ 26, 29, 52, 128(b), 141].

  o The MSA unconscionably conceals the True Cost by making no mention at all that the customer will need to incur significant Implementation costs multiple times the cost of the contract. [ECF 23 ¶¶ 5, 59, 140]

### D.    The Complaint Properly Pleads Actionable Statements that are Not Puffery.

Salesforce argues that the Plaintiff's fraud-based claims are not properly pled under the Fed.

Rule of Civ. Proc. Rule 9(b) and the statements are nonactionable.  As Salesforce acknowledges, federal

1   courts apply state law to determine whether the elements have been pled sufficiently. [ECF 24 at 24].

2   The California False Advertising Law ("FAL") prohibits companies from making any statement

3   concerning the business's products or services that is untrue or misleading and that is known, or by the

4   exercise of reasonable care should be known, to be untrue or misleading. Cal. Bus. & Prof. Code §

5   17500.  A statement is "untrue or misleading" under the FAL if "members of the public [are] likely to be

6   deceived by the advertising."  *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 120 (2009).  This

7   standard covers not only statements that are false, but statements "which, although true, [are] either

8   misleading or which ha[ve] a capacity, likelihood or tendency to deceive or confuse the public." *Cullen*

9   *v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1025-26 (N.D. Cal. 2012). Courts consider whether a reasonable

10  consumer is likely to be deceived. *In re Vioxx*, 180 Cal. App. 4th at 130.

11      An advertisement that is not literally true is not actionable if it qualifies as "mere puffery."

12  Whether a statement constitutes puffing "is often a close question that must be viewed within the context

13  of the totality of circumstances."  (*U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co*. (S.D.N.Y. Mar. 5,

14  2013) U.S. Dist. LEXIS 38768, at *18-23 ("*PHL*").)  For instance, in *In re Countrywide Financial Corp.*

15  *Securities Litig.*, 588 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008), the Court found the complaint

16  adequately alleged that defendant's practices "so departed from its public statements that even 'high

17  quality' became materially false or misleading; and that to apply the puffery rule to such allegations

18  would deny that 'high quality' has any meaning." The Court explained: "to understand Plaintiffs'

19  claims, one must first understand the facts Plaintiffs allege about [defendant's] core operations." *Id*.  In

20  so doing a court reads the complaint as a whole, together with matters appropriate for judicial notice,

21  rather than isolating allegations and taking them out of context. See *Tellabs* at 2509.

22      Here too, there is a need to understand facts about Salesforce's "core operations" to understand

23  why the statements are *not*, as Salesforce alleges, "generalized sales talk" [ECF 24 at 22:10], but instead

24  *are* "reasonably interpreted as statement[s] of objective fact" [ECF 24 at 21:6-7] about "specific

25  characteristics" [ECF 24 at 21:14] of Salesforce's software.  The FAC alleges the "Salesforce business

26  model is centered around a ubiquitous marketing campaign that misrepresents the costs, ease-of-use,

27  flexibility, and performance capabilities of the Salesforce software to lure individuals and businesses to

28  enter into unconscionable, unlawful adhesion contracts that: (i) misrepresent the cost of the software by

material amounts, (ii) impose no material obligations on Salesforce, and (ii) make it impossible to cancel for any reason."  [ECF 24 ¶2].

The FAC alleges: "[s]ince before 2019, and continuing today, Salesforce has engaged in a long term practice of consistently advertising, including but not limited to on its website(s) that is CRM systems are 'quick and easy'[to implement]  are 'very cost-effective in terms of capital outlay,' 'keep IT costs low,' are 'extremely flexible,' and warrants that 'you're not paying for any features that are not useful to you'."  [ECF 23  ¶¶ 150, 153-154]. Each of the disputed representations refers to a "specific characteristic" that Plaintiffs allege Salesforce has "repeatedly and consistently represented" "in a "long-term advertising campaign" as a distinguishing feature of its software.  Salesforce represents the software possesses certain characteristics, including that it is flexible solution ('extremely flexible,' and 'you're not paying for any features that are not useful to you'); efficient (cost-effective, IT costs low) and easy-to-use (quick and easy to implement, do not need special installation).  These are not "vague statements of optimism such as 'favorable impact'." *West v. eHealth, Inc*., 2016 U.S. Dist. LEXIS 33429, at *21-22 (N.D. Cal.) (J. Donato).  They are "particularized .... claims about a product's characteristics and functionality." *McLellan v. Fitbit, Inc*., 2018 U.S. Dist. LEXIS 94685, at *6-7 (N.D.Cal.) (J. Donato).

Indeed, Salesforce touts these same "specific characteristics" in its SEC filings – where public companies are required to make "statements of objective fact" – not "generalized sales talk."  On the first page of its most recent 10-k, Salesforce states:

> Our Customer 360 service offerings are designed to be flexible, scalable and easy to use. They can generally be configured easily, deployed rapidly and integrated with other platforms and enterprise applications. We sell to businesses worldwide, primarily on a subscription basis, through our direct sales efforts and also indirectly through partners.

[RFJN ECF 14, Ex. E) (Salesforce's Annual Report (Form 10-K) March 6, 2024).

Salesforce's 10-K further states: "The key advantages of our solutions include" that they are "scalable, efficient and *flexible solutions for any size company* or industry" and provide "the ability to accelerate adoption  ... [with] . . . tools and processes that deliver *out-of-the-box functionality*." [RFJN ECF 14 at E].  The representations in Salesforce's 10-K bolster Plaintiff's claims that Salesforce

1  "repeatedly and consistently represented" that its software possessed these objective "characteristics and

2  functionalities" (*McLellan v. Fitbit, Inc*., 2018 U.S. Dist. LEXIS 94685, at *6-7); and they "engaged in a

3  ubiquitous marketing campaign that misrepresents the costs, ease-of-use, flexibility, and performance

4  capabilities of the Salesforce software to induce individuals and businesses to enter into unconscionable,

5  unlawful adhesion contracts" and they continue to make these representations. [FAC ¶¶ 2, 3 ; RFJN ECF

6  14 Ex E].

7      Salesforce alleges its claims that its software is "cost-effective" and "flexible" are puffery. Even

8  qualitative statements, however, can misrepresent existing facts where, as here, those statements are

9  belied by conditions known to the defendants. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)

10  (statements that inventory situation was "in good shape" or "under control" when defendants knew

11  contrary was true were false and misleading); *see also Vigil v. General Nutrition Corp.,* 2015 U.S. Dist.

12  LEXIS 63506 at *9 (S.D. Cal. May 13, 2015) ("maximum potency" was not puffery because it

13  "arguably promise[d] consumers that the product [was] capable of producing *some* …potency.").

14      Here, "cost-effective" does not mean customers will pay multiple times the contract amount in

15  undisclosed costs to implement and use the software. Likewise, "flexible" does not mean you cannot

16  make any changes or cancel for any reason, even if you cannot use the software.

17      Indeed, courts have specifically found "flexible" to be actionable.  In *PHL*, 2013 U.S. Dist.

18  LEXIS 38768, at *22-23, the Court explained "statements such as 'flexible' and 'lower premium

19  payments' can be specific or absolute characteristics." *Id*.  The Court explained:

20       "These statements, while not reflecting 'absolute' or 'measurable' characteristics of the
        [insurance] Policies, describe the[ir] essential, distinguishing characteristics… Words
21       such as 'flexible' or 'lower premium payments' alone may be nonactionable opinions,
        but when considered in their full context, these statements could be more than mere sales
22       puffery. If, as alleged, the policyholder could not … adjust the amount of monthly
        payments without being penalized … the Policies departed from their advertised
23       characteristics. …. These statements did not describe simply what PHL hoped the
        Policies to achieve in the future -- like economic projections or expressions of optimism
24       generally held to be puffery -- but were intended and understood to describe the essential
        characteristics of the Policies. To find them to be mere puffery would drain all meaning
25       from descriptions such as 'flexible' or 'lower premium payments' and leave
        policyholders unable to rely on any qualitative descriptions of insurance policies. ....
26       Assuming, as the Court must at this stage, the accuracy of the plaintiff's allegations
        regarding the defendant's representations, these statements could qualify as
27       misrepresentations of fact."

28

*PHL*, at *18-23.); see also *Rodriguez v. Walmart Inc.,* 2023 U.S. Dist. LEXIS 53253, at *14 (S.D.N.Y.) ("stay-put flexible patch" not puffery because whether the patch tends to remain adhered and flex along with movements is an objective question).

Falsity is alleged when a plaintiff points to the defendant's statements that directly contradict what the defendant knew at that time. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794-96 (9th Cir. 2017). The FAC alleges sufficient facts explaining why the misrepresentations were false and misleading given what Salesforce knows about its predatory practices, and Plaintiffs expect discovery will confirm the extent of their knowledge. [ECF 23 ¶¶ 3, 4, 7, 23, 32]. The FAC also pleads reliance. [ECF 23 ¶ 32]. To the extent the intentional falsity of these statements is at issue, it is an issue of fact not properly before this court.

### E.    Breach of the Implied Covenant

The FAC alleges that the only terms that Plaintiffs consented to and only agreement they signed was the Order Form contract. [ECF 23:41-44]. Plaintiffs allege they never viewed, signed, or agreed to the terms of the MSA. Cites. The Order Form contracts provide the payment terms for plaintiffs' "utilization" of certain identified software. [ECF 23 at 43]. The FAC alleges that Salesforce knew that in order to utilize the software, plaintiffs would need to pay "multiple times the contract amount" yet Salesforce intentionally concealed the True Costs. Cf. *Sarchett v. Blue Shield* 43 Cal. 3d 1, 13 (1987) (failure to inform plaintiff of contractual rights was breached the duty of good faith). The FAC also alleges that the undisclosed MSA terms impose illusory performance obligations on Salesforce, such that Salesforce "was in essence guarantying nothing about what the product would do. Since a product's performance forms the fundamental basis for a sales contract, it is patently unreasonable to assume that a buyer would purchase [complex software] from an industry seller without any enforceable performance standards." A & M., 135 Cal. App. 3d at 493 (citations omitted).

In short, the FAC pleads facts upon which a jury could find that Salesforce intentionally processes its contracts to conceal the unconscionable terms of the MSA. Salesforce's practices defy reasonable commercial expectations where every purchase online is accompanied by a compulsory review of terms of service before the purchase is finalized. Salesforce's opaque practice suggest its "preference that the buyer will be dissuaded from reading that to which he is supposedly agreeing"

1   (*Klein v. Asgrow Seed Co.* 246 Cal.App.2d 87, 97 (1966)).  The FAC pleads facts upon which a jury

2   could find that Salesforce breached the duty of good faith and fair dealing including by exercising its

3   discretion under the MSA to systematically and uniformly refuse to allow any customer to cancel its

4   subscription for any reason.

5          **F.    Plaintiffs State a Claim for Rescission.**

6          Salesforce correctly states the disjunctive requirements for rescission.  [ECF 24 at 26:15-17].

7   The FAC pleads facts that satisfy all of them. *First*, the FAC alleges that Plaintiffs' consent to the Order

8   Form contract was obtained by mistake, at a minimum, and fraud may be shown with the benefit of

9   discovery.  Salesforce Sales Agents used aggressive direct marketing tactics and made express false

10  promises about the functionality and the True Costs of the software, all while concealing the MSA's

11  egregious one-sided terms that defy all reasonable expectation, including by universally prohibiting

12  cancellation for any reason, including when there is ample evidence of false promises, as there was here.

13  Plaintiffs each state they did not consent to the unconscionable terms of the MSA, and Salesforce did not

14  require them to review or agree to those terms.  [ECF 23 ¶¶ 89, 116.]  Moreover, even if plaintiffs had

15  reviewed the MSA, which they did not; the MSA does not disclose the exorbitant implementation costs,

16  multiple times the cost of the contract term (*e.g*, $50-100k for a $10k contract [ECF 23 ¶ 59]), without

17  which the expensive subscription services hold *zero* value.

18         Salesforce's claim that the MSA "explicitly references" implementation requirements is

19  disingenuous.  The alleged "explicit reference" in the MSA is under the heading "Non-SFDC

20  (Salesforce) Products and Services," and it states only that "SFDC or third parties may make available . .

21  . third-party products or services, including, for example, Non-SFDC Applications and implementation

22  and other consulting services."  Salesforce loses credibility by characterizing this as an "explicit

23  reference" and suggesting it adequately notifies contracting parties that they will be unable to use the

24  expensive SaaS services they are contracting for in any way without spending multiple times the

25  contract amount to implement the software.  And Salesforce further diminishes its credibility by

26  misquoting the alleged "disclosure" in the Order Form, which SFDC quotes as saying: "Professional

27  Services is recommended for optimal implementation" [ECF 24 at 26], but which actually says

28  Professional Services is recommended for optimal implementation of Predictive Email Content.

Implementation of Predictive Email Content is not required for use of other features within the Pro Edition." It also only applies to one specific software "ExactTarget-Pro Edition," which the FAC does not allege any plaintiff used.

*Second*, the FAC pleads a failure of consideration. Plaintiffs do not complain, as SFDC states, that they could not "fully utilize" the service. They allege they could not use the software at all. [ECF 23 ¶¶ 6, 9, 10, 143.] *Third*, the FAC pleads ample facts supporting a determination that Salesforce's contracts and practices are unlawful and against the public interest, as described above.

*Finally*, SFDC's assertion that rescission is not possible here is unavailing. As the California Supreme Court explained, while "[t]he general rule is that one must rescind all of his contract . . . this rule is not controlling in the case of a severable or divisible contract. *Simmons v. California Institute of Technology* 34 Cal. 2d 264 (1949). Moreover, "the test of whether a contract is divisible is that if the consideration is single, the contract is entire, but if the consideration is apportioned, the contract may be regarded as severable." The FAC specifies that "Plaintiffs with future obligations seek to rescind their divisible, executory contracts." [ECF 23 ¶ 11; *see also* ¶¶ 166, 168, and Prayer ¶ 5].

### V.    <u>CONCLUSION</u>

Plaintiff respectfully requests that the Court issue an order denying Defendant's Motion to Dismiss in its entirety and to set a case management conference so the parties can commence discovery.

Date: February 6, 2025

Respectfully submitted,
**STUART ALBAN LAW, PC**


By: _____

**Courtney Stuart-Alban**
*Lead Counsel for Plaintiffs*
*and the Putative Class*


Date: February 6, 2025

Respectfully submitted,
**SINGIAN LAW**

By: _____

**Lizelle S. Brandt**
*Co-Counsel for Plaintiffs*
*and the Putative Class*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS